UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION
DOCKET NO. 3:16-cv-552

| | | |
|---|---|---|
| **DR. JAMES ROBERT WHITE,** | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| Vs. | ) | ORDER |
| | ) | |
| **GASTON COUNTY BOARD OF EDUCATION,** | ) | |
| | ) | |
| Defendant. | ) | |

**THIS MATTER** is before the court on defendant's Motion for Summary Judgment (#38) and defendant's Second Motion to Continue Trial and Pretrial Deadlines (#60). Having considered defendant's motions and reviewed the pleadings, the court enters the following Order.

## I.    Background

Plaintiff, an African-American man, was employed by defendant as an assistant principal by Gaston County Schools ("GCS") from August 2006 through July 2013, with a tenure spanning multiple schools. From 1973 to 1993, plaintiff was a guidance counselor for Charlotte-Mecklenburg Schools ("CMS"), until he left to pursue a doctoral degree. Between 1997 and 2006, plaintiff held several part-time and/or temporary positions in education.

Plaintiff's superiors included Reeves McGlohon, a white male who served as superintendent of GCS for approximately seven years. Plaintiff was originally hired by defendant in 2006 on Mr. McGlohon's recommendation, and in 2009, Mr. McGlohon recommended that plaintiff be given a second contract as an assistant principal.

Another superior was Dr. Dixie Abernathy, who was the Assistant Superintendent of Elementary Schools for GCS at all relevant times. Dr. Abernathy has experience as a classroom teacher, assistant principal, and principal. As Assistant Superintendent, Dr. Abernathy's role was to supervise and support the principals of 32 elementary schools within GCS.

In 2006, Plaintiff was first assigned to Tryon Elementary School, working under Principal Terry Usery, a white male. Plaintiff generally received evaluations of "at standard" or "above standard," though he also received two letters of reprimand. In March 2010, plaintiff was transferred to Rhyne Elementary School, where his supervisor was Principal Joey Hopper, also a white male. Plaintiff received an initial rating of "above standard"; under a new rating standard for the 2010-2011 school year, plaintiff's ratings ranged from "proficient" to "distinguished."

In October 2010, an African-American female fifth-grade student (referred to as "A.C.") wrote a note to the school's guidance counselor, Rachel Vanzant, about her white male teacher, indicating that he made her uncomfortable. Plaintiff testified he told A.C. to write a note to the school counselor. According to plaintiff, Ms. Vanzant told him that A.C. had accused her teacher of sexual assault and that Principal Hopper had asked the teacher to handle it. Plaintiff directed Ms. Vanzant to tell the director of guidance, but did not inform Principal Hopper of the student's accusation or question Principal Hopper's handling of the situation. Plaintiff reported the incident to Dr. Abernathy when Dr. Abernathy called him roughly three weeks after the allegations were made, though plaintiff did not ask Dr. Abernathy to take any action or share the allegations with A.C.'s mother.

In February 2011, A.C.'s mother contacted plaintiff to ask why nothing had been done about her daughter's accusation. Plaintiff told A.C.'s mother to call Dr. Abernathy. Dr. Abernathy

in turn contacted plaintiff and told him that she and Dr. Tutterow, the Assistant Superintendent of Human Resources, would investigate. In March 2011, the Gastonia Police Department investigated the student's allegations and determined they were unfounded. Following her conversation with plaintiff, Dr. Abernathy investigated how the school principal had handled A.C.'s allegations. On March 15, 2011, Dr. Abernathy reprimanded Mr. Hopper for his inadequate investigation.

Around the same time, plaintiff spoke with Wavey Williams, a former physical education teacher in GCS, that a student may have been sexually assaulted. Plaintiff spoke to him because Mr. Williams was a minister and someone plaintiff respected and trusted. Plaintiff was unaware that Mr. Williams knew A.C.'s mother. Plaintiff also did not encourage Mr. Williams to contact the NAACP, and that was not plaintiff's purpose in sharing the information with him. Nor did plaintiff tell Mr. Williams that race was an issue.

On May 18, 2011, Mr. McGlohon recommended (and defendant approved) a number of administrative transfers, including plaintiff's transfer to Forestview High School. Plaintiff was pleased, as he had previously expressed a desire to be in a high school environment. However, near the end of May 2011, plaintiff had lunch with A.C. Ms. Vanzant saw plaintiff and A.C. in his office and told plaintiff he shouldn't eat with A.C. alone. On or around June 2, 2011, plaintiff told A.C.'s mother that Ms. Vanzant had warned him not to have lunch alone with her daughter. Also on or around June 2, 2011, a representative of the NAACP met with Dr. Abernathy about A.C.'s allegations. Later that day, plaintiff was summoned to Dr. Abernathy's office. Plaintiff said he was in the meeting to answer Dr. Abernathy's questions on what he told A.C.'s mother about Ms. Vanzant's warning, and did not participate in any discussion with the NAACP representative about A.C.'s allegations or the school's investigation. Dr. Abernathy subsequently gave plaintiff a

written reprimand for his unprofessional communication with a parent about his coworkers. And at a meeting with defendant on June 20, 2011, Mr. McGlohon informed defendant that six of seven principals were satisfied with their assignment of a new assistant principal, but that an assistant principal was still being sought for Forestview (despite previous approval of plaintiff for that position). Plaintiff was instead transferred to North Belmont Elementary School, where he would work under principal Chris Germain, a white male.

Plaintiff's stay at North Belmont was short, lasting only from August to September of 2011. Plaintiff did not show up for his first day of work or contact Germain. After plaintiff's relationship with Germain quickly deteriorated, as Germain expressed on multiple occasions that plaintiff's communication skills were strongly lacking, plaintiff was again transferred in late September 2011, this time to Catawba Heights Elementary School.

At Catawba Heights, plaintiff worked under the direction of principal Phyllis Whitworth, an African American female. During his time there, Ms. Whitworth expressed repeated concerns with plaintiff's interpersonal and communication skills, and implemented measures she believed would help plaintiff, such as mandatory check-in times and improvement plans to address her concerns with plaintiff about insubordination. Plaintiff repeatedly complained about such measures, believing them to be subjective and unjustified, but Dr. Abernathy and Mr. McGlohon expressed support for Ms. Whitworth and told plaintiff to continue following his supervisor's instructions. Through spring of 2013, plaintiff accumulated various reminders, warnings, and letters of reprimand from Ms. Whitworth, as well as evaluations that rated him positively in some areas but negatively in others. Ultimately, Ms. Whitworth asked Dr. Abernathy that plaintiff not be returned to Catawba Heights, or that she be moved instead.

On April 25, 2013, plaintiff was notified of the superintendent's intent to recommend that his contract not be renewed, as well as general reasons underlying Mr. McGlohon's recommendation. Plaintiff requested a hearing with defendant, and at the hearing, defendant was presented with a written submission on behalf of the superintendent explaining that the recommendation was based on "a pattern of responding inappropriately to supervisory contacts and displaying poor judgment in communications with other public education stakeholders," as well as supporting documents. Plaintiff was given the opportunity to present his own evidence. Following the hearing, defendant voted to uphold the superintendent's recommendation, and when plaintiff's contract expired, it was not renewed.

Plaintiff did not appeal defendant's decision, nor file a charge of discrimination with the EEOC. Instead, plaintiff filed a complaint with the Department of Education's Office for Civil Rights, which conducted an investigation and found insufficient evidence that there had been a violation of Title VI or Title IX.

On June 20, 2016, plaintiff filed this action *pro se* in Mecklenburg County Superior Court. The original Complaint sought legal and equitable relief under the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000 *et seq.* ("Title VI"); 42 U.S.C. § 1981; 42 U.S.C. § 1983; N.C. Gen. Stat. § 143.422.2; and various other State law claims. Defendant removed the action to this Court pursuant to 28 U.S.C. § 1441.

On October 12, 2016, counsel for plaintiff noticed their appearance in this case. On October 25, plaintiff filed a Motion for Leave to Amend Complaint, which was granted; plaintiff's Amended Complaint sought to streamline and clarify allegations, omitted certain claims, and added a new Title IX retaliation claim. On February 1, 2017, plaintiff filed a Second Amended Complaint. In this complaint, plaintiff alleges a Title VI discrimination claim, race discrimination

and hostile work environment claims, and retaliation claims under § 1981, § 1983, and Title IX. Discovery has been completed pursuant to the March 30, 2017 scheduling order. Defendant filed the instant Motion for Summary Judgment (#38), plaintiff has responded (#50), and the motion is ripe for review.

## II.     Legal Standard

Summary judgment is warranted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). A factual dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). A fact is material only if it may affect the suit's outcome under governing law. Id. The movant has the "initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact." Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986) (internal citations omitted). The burden then shifts to the nonmoving party. That party "must set forth specific facts showing that there is a genuine issue for trial." Id. at 322 n.3. The nonmoving party may not rely upon mere allegations or denials of allegations in pleadings to defeat a motion for summary judgment. Id. at 324. Instead, that party must present sufficient evidence from which "a reasonable jury could return a verdict for the nonmoving party." Anderson, 477 U.S. at 248; accord Sylvia Dev. Corp. v. Calvert Cnty., Md., 48 F.3d 810, 818 (4th Cir. 1995).

The Court views evidence and any inferences from evidence in the light most favorable to the nonmoving party. Anderson, 477 U.S. at 255. "'Where the record taken as a whole could not

lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial.'" Ricci v. DeStefano, 557 U.S. 557, 586 (2009) (quoting Matsushita v. Zenith Radio Corp., 475 U.S. 574, 587 (1986)). The question posed by summary judgment is whether the evidence "is so one-sided that one party must prevail as a matter of law." Anderson, 477 U.S. at 252.

Finally, it is worth noting that summary judgment is "not inappropriate in discrimination cases simply because they involve issues of intent and motive." Gary v. Freightliner, 394 F.Supp.2d 773, 777 (W.D.N.C. 2005), aff'd 169 F. App'x 756 (4th Cir. 2006). When faced with a motion for summary judgment, plaintiff cannot rely on possibilities to which a jury may infer a discriminatory motive, but instead "must come forward with sufficient evidence to establish a prima facie case and respond sufficiently to any rebuttal . . . to create a genuine issue of material fact." Id. Thus, even if plaintiff establishes a prima facie case, but defendant has rebutted with a proffer of a legitimate, non-discriminatory reason, a genuine issue of material fact is not automatically presented; indeed, "[t]he Fourth Circuit has clearly held that, at a minimum, proof of pretext is required to survive a defendant's motion for summary judgment." Id. at 777-78.

## III. Discussion

The court has reviewed defendant's Motion for Summary Judgment (#38) and Memorandum in Support (#41), plaintiff's Memorandum in Opposition (#50), defendant's Reply (#55), and plaintiff's Surreply (#59). The court will evaluate each of plaintiff's claims in turn.

### a. Plaintiff's First Amendment retaliation claim under § 1983

First, the court considers plaintiff's First Amendment retaliation claim. "To state a First Amendment § 1983 claim, a plaintiff must establish three elements: (1) the plaintiff's right to speak was protected; (2) the defendant's alleged retaliatory action adversely affected the plaintiff's

constitutionally protected speech; and (3) a causal relationship existed between the plaintiff's speech and the defendant's retaliatory action." Ansel v. Hicks, 2012 WL 4511187, at *10 (W.D.N.C. 2012) (citing Suarez Corp. Indus. v. McGraw, 202 F.3d 676, 685-86 (4th Cir. 2000)). In the public school context, speech "is protected by the First Amendment when (1) the teacher speaks as a citizen about matters of public concern and (2) the teacher's interest in exercising free speech is not outweighed by the countervailing interest of the state in providing the public service the teacher was hired to provide." Stroman v. Colleton County Sch. Dist., 981 F.2d 152, 155-56 (4th Cir. 1992) (citations omitted). Whether the speech relates to public concern or expresses private grievance or self-interest is "determined by the content, the form, and the context of the speech" and is an issue "of law, not fact, for the court to decide." Id.; see also Hunter v. Town of Mocksville, N. Carolina, 789 F.3d 389, 397 (4th Cir. 2015) (holding that, in determining whether a public employee is speaking as an employee or a citizen, courts must "engage in a 'practical' inquiry into the employee's 'daily professional activities' to discern whether the speech at issue occurred in the normal course of those ordinary duties").

The court notes that plaintiff's Memorandum in Opposition (#50) failed to offer any opposition to summary judgment on this claim, suggesting that plaintiff has conceded this claim. Nevertheless, in the interests of thoroughness, the court will evaluate the claim. Here, plaintiff's claim relies on his "complaints about the failure of the Defendant to properly investigate the sexual abuse complaint of a minor African American student and related matters." Doc. #24 at 9-10. The record shows plaintiff's speech relating to A.C. is as follows: (1) his initial advice to A.C. to write a note to the guidance counselor; (2) his direction to Ms. Vanzant to contact her boss, the director of guidance; (3) his initial conversation with Dr. Abernathy shortly after the incident; (4) his

assistance to A.C.'s mother in contacting Dr. Abernathy; (5) his conversation with Dr. Abernathy in February 2011; (6) assorted complaints into how the school handled the investigation into A.C.'s claims; and (7) his conversation with Mr. Williams where plaintiff told him that a student may have been sexually assaulted.

As a matter of law, the court finds that the first six instances of speech are clearly part of plaintiff's ordinary duties. Advising a student to talk to a counselor, directing a guidance counselor to contact her superior, speaking with the superintendent, assisting a student's mother in reaching an administrator, and voicing concern about school procedures are all well within the duties of a school's assistant principal. As they are "ordinarily within the scope of an employee's duties," they are not protected under the First Amendment and thus cannot be the basis of a claim. Hunter, 789 F.3d at 397; see also J.W. v. Johnston County Bd. Of Educ., 2014 WL 4771613, at *10 (E.D.N.C. 2014) (holding that plaintiff's discussion with supervisor regarding handling of an alleged sexual assault of a student was pursuant to job duties as a teacher).

The last instance of plaintiff's speech, his conversation with Mr. Williams about the potential sexual assault of a student, may be outside his duties as a school counselor. The record indicates that plaintiff was speaking to Mr. Williams as a friend for personal advice, not as part of his typical day as an assistant principal. That said, it would be difficult to call this "speak[ing] as a citizen about matters of public concern." Stroman, 981 F.2d at 156. Instead, it is likely that going to a personal friend for advice is the sort of "self-interest" speech that removes it from First Amendment protection. Id.

However, even assuming that such speech did qualify as protected speech under the First Amendment, plaintiff has failed to offer any evidence to connect the decision not to renew his

contract to his conversation with Mr. Williams. Indeed, nothing in the record suggests that defendant was even aware of plaintiff's conversation with Mr. Williams, or that the conversation may have led to the NAACP's involvement in the matter. Failure to show such facts is fatal to plaintiff's First Amendment speech claim. See Constantine v. Rectors & Visitors of George Mason Univ., 411 F3d 474, 501 (4th Cir. 2005) ("In order to establish [a] causal connection, a plaintiff in a retaliation case must show, at the very least, that the defendant was aware of [his] engaging in protected activity"); Peters, 327 F.3d at 323 (holding that plaintiff bears the burden of establishing that protected speech "was a motivating factor or played a substantial role" in defendant's adverse employment action). As plaintiff alleges no facts that defendant was even aware of plaintiff's conversation with Mr. Williams, or provides any evidence that said conversation was a motivating factor in defendant's decision not to renew plaintiff's contract, the court will grant summary judgment for defendant as to the First Amendment claim.

   *b.  Plaintiff's racial discrimination claims under Section 1981 and Title VI*

   Next, the court considers plaintiff's racial discrimination claim. Plaintiff contends that the non-renewal of his employment contract in July 2013 was an adverse employment action rooted in racial discrimination, pursuant to 42 U.S.C. § 1983, based on rights asserted under 42 U.S.C. § 1981. Plaintiff also alleges racial discrimination under Title VI.

   As a preliminary matter, Title VI is generally not an appropriate avenue for employment discrimination claims. See Johnson v. Transportation Agency, Santa Clara County, 480 U.S. 616, 627 n. 6 (1987) (noting congressional concern that Title VI's reach be kept distinct from Title VII). Specifically, "to survive a motion for summary judgment under Section 604 of Title VI, a litigant must provide facts to show that: (1) the employer received federal financial assistance for the

primary purpose of providing employment, or (2) the employment discrimination was against a primary beneficiary of the federal financial assistance." Fordyce v. Prince George's County, 43 F.Supp.3d 537, 545 (D. Md. 2014). "When a plaintiff fails to show any evidence that a defendant receives federal funds for employment purposes, a Title VI claim cannot be sustained." Barbero v. Catawba Valley Legal Servs., Inc., 1995 WL 757738, *2 (W.D.N.C. 1995).

Here, defendant contends that plaintiff has offered no evidence that defendant received federal funds for employment purposes. However, plaintiff points out that defendant has already admitted in their Answer (#27) to the Second Amended Complaint that defendant received federal financial assistance from the U.S. Department of Education and that the primary purpose of said assistance was to create teaching and administrative jobs and maintain existing ones. Doc. #27 at pg. 3, ¶ 5. Specifically, defendant admitted that, from 2010 to 2012, defendant received allocations of Federal Education Jobs Funds as part of the American Recovery and Reinvestment Act ("ARRA"). Id. Given this admission, defendant cannot dispute receiving federal financial assistance for providing employment, as is required to maintain a Title VI claim. 42 U.S.C. § 2000d-3; Fordyce, 43 F.Supp.3d at 545. Therefore, plaintiff's Title VI claim will be analyzed along with his Section 1981 claims.

Plaintiff may prove racial discrimination by direct evidence of intentional discrimination or prove discriminatory intent through circumstantial evidence via the McDonnell Douglas burden-shifting framework. See Brewer v. Dana Corp. Spicer Heavy Axle Div., 205 F.Supp.2d 511, 519 (W.D.N.C. 2002). To establish a prima facie case of discriminatory discharge in the absence of direct evidence, plaintiff must show: "(1) he is a member of a protected class, (2) he suffered an adverse employment action, (3) he was performing his job duties at a level that met

the employer's legitimate expectations at the time of the adverse employment action, and (4) his position remained open or was filled by a similarly qualified applicant outside the protected class." Safari v. Cooper Wiring Devises, Inc., 2012 WL 1247149, at *7 (W.D.N.C. 2012), aff'd, 529 F. App'x. 372 (4th Cir. 2013).

In such matters, it is relatively simple to determine whether a plaintiff is a member of a protected class or suffered an adverse employment action. The "pivotal inquiry" is thus whether "at the time of his discharge plaintiff was meeting his employer's legitimate expectations." Jones v. Dole Food Co., Inc., 827 F.Supp.2d 532, 547 (W.D.N.C. 2011), aff'd, 473 F. App'x 270 (4th Cir. 2012). Such inquiry "requires the court to focus on the employer's perceptions, not the perceptions of the employee." Id.; see also Addison v. CMH Homes, Inc., 47 F.Supp.3d 404, 420 (D.S.C. 2014) (holding that plaintiff's performance "is evaluated at the time of the alleged adverse action" and "it is the perception of the decision maker which is relevant, not the self-assessment of the plaintiff") (citing King, 328 F.3d at 149). Additionally, the fourth element is key and may not be ignored by plaintiff. While the Fourth Circuit has recognized exceptions to the requirement that a plaintiff show replacement by an individual outside of the protected class, a plaintiff may not "bypass prong four whenever the . . . evidence gives rise to an inference of discrimination." Miles v. Dell, Inc., 429 F.3d 480, 487 (4th Cir. 2005).

Plaintiff also argues that he suffered a racially hostile work environment. To prevail on a racial hostile work environment claim, plaintiff must establish "(1) unwelcome conduct; (2) that is based on plaintiff's race; (3) which is sufficiently severe or pervasive to alter the plaintiff's conditions of employment and to create an abusive work environment; and (4) which is imputable to the employer." Id. (also noting that the same test applies to a hostile work environment claim

under 42 U.S.C. § 1981); see also Hartsell, 123 F.3d at 773. In determining whether an environment is hostile, the court considers all the circumstances, including "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." Faragher v. City of Boca Raton, 524 U.S. 775, 777-78 (1998).

Finally, plaintiff alleges retaliation under Title VI and § 1981. 34 C.F.F. § 100.7(e); CBOCS West, Inc. v. Humphries, 553 U.S. 442 (2008) (holding that Section 1981 encompasses claims of retaliation). Federal courts analyze violations of Section 1981 and Title VI under the same standards as Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e, *et seq.* See Boyer-Liberto v. Fontainebleau Corp., 786 F.3d 264, 281 n. 5 (4th Cir. 2015) (noting that, while the *prima facie* elements remain the same, the causation standard for Section 1981 claims may differ from Title VII's); Honor v. Booz-Allen & Hamilton, Inc., 383 F.3d 180, 188 (4th Cir. 2004) (providing *prima facie* standards for retaliation under § 1981 identical to those used in Title VI and Title IX). In evaluating such claims, the court essentially uses the McDonnell Douglas framework. Pascual v. Lowe's Home Centers, Inc., 193 F. App'x. 229, 232 (4th Cir. 2006). First, the plaintiff must make out a *prima facie* case for retaliatory discharge, by alleging sufficient facts to demonstrate that (1) he engaged in protected activity; (2) defendant took materially adverse action against him; and (3) a causal connection exists between the protected activity and the alleged adverse action. Caldwell v. Johnson, 289 F. App'x. 579, 592 (4th Cir. 2008); see also Darveau v. Detecon, Inc., 515 F.3d 334, 341-42 (4th Cir. 2008) (highlighting the difference between the previous "adverse employment action" and the current "materially adverse" standard). Should plaintiff successfully establish a *prima facie* case, defendant may rebut it by showing a

nondiscriminatory reason for the adverse employment action. Pascual, 193 F. App'x. at 232. If defendant is successful, the burden returns to plaintiff to demonstrate that the explanation for the action was pretext for intentional retaliation. Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 147-48 (2000).

In all of these claims, the court is uncertain that plaintiff has truly met their burden to survive summary judgment. For example, on plaintiff's claim of discriminatory discharge, he has not alleged any facts about his replacement being outside the protected class, or argued that an appropriate exception applies. Plaintiff has not argued that his position was left open or that his replacement came from outside the protected class. Nor is there evidence that any of an array of exceptions applies that would allow for his racial discrimination claim to proceed, such as that a white assistant principal had his contract renewed despite markedly worse performance. Miles, 429 F.3d at 487. On plaintiff's Title VI and Section 1981 claims, plaintiff's evidence is that he is African-American, A.C. is African-American, the teacher that allegedly sexually assaulted her is white, the NAACP launched its own investigation, and an email from one of his supervisors suggested that he thought plaintiff would work well with Ms. Whitworth, an African-American, given their shared status as a minority.

Even combined, the court is uncertain that this is sufficient to allow claims of racial discrimination to survive summary judgment. Indeed, the court has closely reviewed the record for further evidence to support plaintiff's argument that his mistreatment by superiors and colleagues was based on his race, but has not found more. For example, plaintiff's superiors, including Mr. Germain and Ms. Whitworth, never made any comments relating to plaintiff's race at all. Plaintiff also did not express any racial discrimination concerns to Mr. McGlohon before

-14-

filing suit and he conceded in his deposition that he never complained of racial discrimination to his superiors. Doc. #40-1, pg. 87. When confiding in Mr. Williams, a personal friend, plaintiff did not allege that race was a factor in how the investigation into A.C.'s allegations was handled. The absence of evidence makes it difficult for the court to find any such unwelcome conduct that would be so severe or pervasive to affect plaintiff's work environment on account of his race or that the non-renewal of plaintiff's contract was a pretext for racial discrimination under Section 1981 or Title VI. The crux of plaintiff's argument that he engaged in protected activity concerning racial discrimination is that a jury could conclude that racial discrimination was in play because the assistant superintendent asked plaintiff into a meeting that an NAACP representative attended; according to plaintiff, in conjunction with the race of plaintiff, A.C., and A.C.'s teacher, this "implicated issues of racial discrimination." Plaintiff's Surreply, Doc. #59, pg. 4-5.

The court is, however, hesitant to cut off plaintiff's case on such fundamentally important claims at this stage, although case law strongly suggests that possibility. See Gary, 394 F.Supp.2d at 777 (holding that a claimant "cannot rely on attenuated possibilities that a jury would infer a discriminatory motive" at the summary judgment stage, but must provide "sufficient evidence to establish a prima facie case"); see also Perry v. Kappos, 489 F. App'x. 637, 643 (4th Cir. 2012) (holding that plaintiff failed to establish a *prima facie* case because his testimony that his supervisor was "uncharacteristically aggressive" about his informal complaint could not create an issue of fact, as that was the kind of "mere speculation" and "building of one inference upon another" that is impermissible at the summary judgment stage, even in retaliation cases). Reading plaintiff's evidentiary proffer of racial discrimination in a manner that would allow a fact finder to draw reasonable inferences in favor of plaintiff, and when considered in conjunction with an email

from plaintiff's superior discussed at greater length below in the context of the Title IX claim, the court will deny defendant's motion for summary judgment on issues of racial discrimination at this time. Evidence that adverse employment actions were taken against a respected African-American educator and administrator for speaking out on behalf of an African-American student -- who was allegedly molested by a white teacher and whose claim, in plaintiff's view and the view of other respected members of the community at the time, was not properly investigated -- is troubling on many levels.

However, the court will closely examine the evidence presented on these issues at trial, and will allow defendant to revisit these issues again on directed verdict after the close of evidence so that the court may ensure that the claims are adjudicated fairly. Speaking from recent experience, the court notes for the plaintiff's benefit that an adverse ruling at that point on a Section 1981 claim may take away from the clearly stronger Title IX claim, discussed *infra*, and could have implications under 42 U.S.C. § 1988 as to an award of attorneys' fees; thus, the court strongly encourages the parties to consider alternative means of resolving these claims before proceeding to trial.

    *c. Plaintiff's retaliation claim under Title IX*

Finally, the court considers plaintiff's retaliation claim under Title IX. Retaliation is firmly established as a violation of Title IX. See Jackson v. Birmingham Board of Education, 544 U.S. 167 (2005); 34 C.F.R. § 106.71 (incorporating 34 C.F.R. § 100.7(e) by reference). Again, federal courts analyze violations of Title IX under the same standards as Title VII. Hooper v. North Carolina, 2006 WL 2850596, at *17 (M.D.N.C. 2006), aff'd, 222 F. App'x 271 (4th Cir. 2007) (noting that the Fourth Circuit applies principles governing Title VII to provide standards for

claims under Title IX). In evaluating such claims, the court essentially uses the <u>McDonnell Douglas</u> framework. <u>Pascual</u>, 193 F. App'x. at 232. First, the plaintiff must make out a *prima facie* case for retaliatory discharge, by alleging sufficient facts to demonstrate that: (1) he engaged in protected activity; (2) defendant took materially adverse action against him; and (3) a causal connection exists between the protected activity and the alleged adverse action. <u>Caldwell</u>, 289 F. App'x. at 592; <u>see also</u> <u>Darveau</u>, 515 F.3d at 341-42 (highlighting the difference between the previous "adverse employment action" and the current "materially adverse" standard). Should plaintiff successfully establish a *prima facie* case, defendant may rebut it by showing a nondiscriminatory reason for the adverse employment action. <u>Pascual</u>, 193 F. App'x. at 232. If defendant is successful, the burden returns to plaintiff to demonstrate that the explanation for the action was pretext for intentional retaliation. <u>Reeves</u>, 530 U.S. at 147-48.

First, the court will consider whether plaintiff can establish a *prima facie* case for retaliation. Plaintiff must first show he engaged in protected activity, which is conduct that "oppose[s] any practice made an unlawful employment practice" by Title VII. 42 U.S.C. § 2000e-3(a). Generally, it falls into two categories: participation, such as participating in an ongoing investigation or proceeding, or opposition, where an employee opposes discriminatory practices in the workplace. <u>Laughlin v. Metropolitan Washington Airports Authority</u>, 149 F.3d 252, 259 (4th Cir. 1998) (citing 42. U.S.C.A. § 2000e-3(a) (West 1994)). The Fourth Circuit has instructed district courts to take an "expansive view of what constitutes oppositional conduct, recognizing that it 'encompasses utilizing informal grievance procedures as well as staging informal protests and voicing one's opinions in order to bring attention to an employer's discriminatory activities.'" <u>DeMasters v. Carilion Clinic</u>, 796 F.3d 409, 417 (4th Cir. 2015) (quoting <u>Laughlin</u>, 149 F.3d at

259); see also Armstrong v. Index Journal Co., 647 F.2d 441, 448 (4th Cir. 1981). Additionally, "while the oppositional activity must be directed to 'an unlawful employment practice' under Title VII . . . we should also interpret 'unlawful employment practice' broadly," such that an employee is protected against both employment actions that are genuinely unlawful under Title VII and employment actions he "reasonably believes to be unlawful." Id. (internal citations and quotations omitted).

Here, defendant has conceded that "for purposes of summary judgment the Court may assume that plaintiff's report to Abernathy concerning the inadequate investigation of an alleged sexual assault at Rhyne was protected activity under Title IX." Doc. #41 at pg. 25. Even without this concession, there is a clear question of fact as to whether plaintiff engaged in informal opposition activity, given his outspoken stance on the investigation into A.C.'s claims of sexual assault and related opinions he voiced to his superiors, colleagues, and others. Even if subsequent investigations ultimately demonstrated no unlawful activity or discrimination happened, the record suggests that plaintiff genuinely believed such unlawful discrimination occurred in the investigation into a female student's sexual assault claim, and that is sufficient to satisfy the standard for a retaliation claim. Peters, 327 F.3d at 320 (citing Biggie v. Albertsons, Inc., 894 F.2d 1497, 1503 (11th Cir. 1990)).  As such, the court finds that a question of fact exists as to the first element of a *prima facie* case of retaliation under Title IX.

The court next considers whether plaintiff has shown that his employer took materially adverse action against him. Previously, a plaintiff had to make a showing of "discharge, demotion, decrease in pay or benefits, loss of job title or supervisory responsibility, or reduced opportunities for promotion." Boone v. Goldin, 178 F.3d 253, 255 (4th Cir. 1999). However, in 2006 the Supreme

Court held that the appropriate standard was whether defendant's action was "materially adverse," in that it "might have dissuaded a reasonable worker from making or supporting a charge of discrimination." <u>Burlington N. & Santa Fe Ry. Co. v. White</u>, 548 U.S. 53, 63-64 (2006). "While changes to the terms, conditions, or benefits of the plaintiff's employment are factors to be considered when evaluating 'all the circumstances,' the lack of such changes is not dispositive on the adverse action component of a retaliation claim." <u>Williams v. Prince William Cty., Va.</u>, 645 F. App'x. 243, 245 (4th Cir. 2016) (citing <u>Burlington</u>, 548 U.S. at 71); <u>see</u> <u>also</u> <u>Lettieri v. Equant, Inc.</u>, 478 F.3d 640, 650 n. 2 (4th Cir. 2007) (noting that the Supreme Court's decision in <u>Burlington</u> broadened the standard to considering injuries and harms beyond merely the terms and conditions of employment).

Here, plaintiff alleges a variety of adverse actions like written reprimands added to his file and performance reviews and meetings that reflected negatively on his conduct, along with yelling by a superior. Such actions are typically not considered materially adverse, unless they are essentially fabricated in support of a later adverse employment action. <u>See</u> <u>Adams v. Anne Arundel County Public Schools</u>, 789 F.3d 422, 429 (4th Cir. 2015) (holding that "reprimands and poor performance reviews occur with some frequency in the workplace" and should only be scrutinized if they are acting as "signposts on a predetermined path to a true adverse employment action"); <u>Cepada v. Bd. of Educ.</u>, 974 F.Supp.2d 772, 788 & n. 51 (D.Md. 2013) (holding that an assistant principal yelling at a teacher is insufficient to constitute a materially adverse action); <u>Jeffers v. Thompson</u>, 264 F.Supp.2d 314, 330 (D.Md. 2003) (an oral or written reprimand, without some actual injury, does not qualify as a materially adverse action). Plaintiff does offer evidence that such reprimands and , in the form of an email from a superior discussing a "game plan" to terminate

plaintiff's employment without preventing the termination from happening. As a result, there is a question of fact as to whether these reprimands and performance reviews are materially adverse actions as "signposts . . . to a true adverse employment action." <u>Adams</u>, 789 F.3d at 429.

Additionally, plaintiff alleges two other major adverse actions: rescinding his transfer to Forestview High School in favor of reassignment to North Belmont Elementary School, and declining to renew his employment contract in 2013. The court first considers whether plaintiff's rescinded transfer constitutes an adverse employment action. In their decision outlining the standards for a materially adverse action, the Supreme Court specifically notes that while job reassignment is not "automatically actionable," it can be an adverse employment action "depend[ing] upon the circumstances of the particular case, and should be judged from the perspective of a reasonable person in the plaintiff's position, considering all the circumstances." <u>Burlington</u>, 548 U.S. at 71 (citations and quotations omitted).

Here, the court finds that there is enough of a question of fact to preclude summary judgment on this issue. The record shows that the canceled transfer and reassignment did not result in a demotion, decrease in pay or benefits, loss of job title or supervisory responsibility, or reduced opportunities for promotion. However, that is not necessarily dispositive of a materially adverse action. <u>Williams</u>, 645 F. App'x. at 245. The question is simply whether a reasonable person in plaintiff's position might have felt dissuaded from supporting a charge of discriminatory conduct. <u>Burlington</u>, 548 U.S. at 71. The record reflects plaintiff's enthusiasm for the proposed transfer, and that defendant was aware of plaintiff's enthusiasm. By rescinding the proposed transfer and sending him to another school shortly after his outspoken conduct, a reasonable jury might conclude that defendant's action was intended to dissuade plaintiff from supporting any more

charges of discriminatory conduct. As such, whether plaintiff's rescinded transfer and reassignment constituted a materially adverse employment action is a question of fact for the jury to decide, not the court.

However, as to whether defendant refused to renew plaintiff's contract constitutes an adverse employment action, this is indisputable. Indeed, defendant's refusal to renew plaintiff's contract in 2013 is at the heart of this matter and clearly constitutes the sort of employment decision that can form the basis of a retaliation claim, even under the previous, stricter standard. Page, 645 F.2d at 233. As such, the court finds that plaintiff has shown that the second element of a *prima facie* case for retaliatory discharge has been satisfied as to the non-renewal of plaintiff's contract.

The court thus turns to the final element of a *prima facie* case: causation. Plaintiff must demonstrate that a causal connection exists between the protected activity (in this case, speaking out about A.C.'s sexual assault allegations) and the asserted adverse action (the assorted reprimands and performance reviews, the canceled transfer and reassignment, and/or declining to renew plaintiff's contract). For purposes of a *prima facie* case, causation may be satisfied purely by temporal proximity, or when "the employer takes adverse employment action against an employee shortly after learning of the protected activity." Price v. Thompson, 380 F.3d 209, 213 (4th Cir. 2004); see also Foster v. University of Maryland-Eastern Shore, 787 F.3d 243, 253 (holding that plaintiff's complaints of perceived retaliation just a month before termination tended to show causation); King v. Rumsfeld, 328 F.3d 145, 151 & n. 5 (4th Cir. 2003) (holding that a ten week gap between protected activity and adverse act was sufficient for *prima facie* causality, albeit weakened). Alternately, if there is a delay between the employer learning of plaintiff's protected activity and the adverse action, plaintiff may demonstrate causation through "other relevant

evidence," such as continuing retaliatory conduct and animus. <u>Lettieri</u>, 478 F.3d at 650. Whether it was the employer's "first opportunity" to take adverse action may also be relevant. <u>See</u> <u>Hinton v. Va. Union Univ.</u>, 185 F. Supp. 3d 807, 838-39 (E.D. Va. 2016); <u>see also</u> <u>Martin v. Mecklenburg Cty.</u>, 151 Fed. Appx. 275, 280 (4th Cir. 2005).

Here, the court finds that plaintiff's evidence on causation is sufficient to raise a question of fact for the jury. For the reprimands and performance reviews, the aforementioned email from a supervisor discussing ways to get rid of plaintiff without getting in trouble is strongly indicative of a causal relationship between protected activity and the reprimands and performance reviews. And should a jury find that the rescinded transfer and reassignment constituted an adverse employment action, temporal proximity is obvious: just over two weeks after defendant became fully aware of plaintiff's informal opposition activity, defendant responded by taking adverse action against plaintiff in rescinding his transfer and reassigning him to another school. While there may not be a "bright temporal line," <u>Perry</u>, 489 F. App'x at 643, for the court to follow, such a brief gap between defendant learning of protected activity and taking adverse action speaks strongly to causation and raises a question of fact for the jury to decide, particularly when gaps of up to ten weeks have been sufficient for *prima facie* causality. <u>King</u>, 328 F.3d at 151.

However, the non-renewal of plaintiff's employment contract is less clear-cut. More than two years separate plaintiff's 2011 informal opposition to the investigation of A.C.'s allegations from the 2013 non-renewal of his contract, rendering temporal proximity inadequate by itself. <u>Clark Cty. Sch. Dist. v. Breeden</u>, 532 U.S. 268, 274 (2001) ("Action taken . . . 20 months later suggests, by itself, no causality at all."). However, the courts have been careful not to adopt a "bright temporal line," <u>Perry</u>, 489 F. App'x at 643, particularly if defendant took the first available

opportunity to terminate employment. See Martin, 151 F. App'x. at 280 (eleven-month gap between protected conduct and adverse action was acceptable, as a jury could reasonably conclude that the defendant fired plaintiff at the first chance they had after learning of the protected activity). However, that is not the case here. Defendant had multiple opportunities to terminate plaintiff's employment at various points prior to 2013. As such, plaintiff must show "other relevant evidence," such as continuing retaliatory conduct and/or animus. Lettieri, 478 F.3d at 650-51 (animus demonstrated by stripping employee of significant job responsibilities and authority in seven month gap between complaint and termination); see also Hart v. Hanover Cty. Sch. Bd., 2013 WL 1867388, at *5 (E.D. Va. 2013) (recognizing that a pattern of harassment, discipline for minor matters, and attempts to provoke plaintiff showed animus, despite a gap of nearly two years between protected activity and adverse action) (citing Robinson v. Se. Pa. Transp. Auth., 982 F.2d 892, 895 (3d. Cir. 1993)). Finally, while the Supreme Court has raised the causation standard for Title VII from "motivating factor" to "but-for" causation, they explicitly noted that this standard does not apply to more broad anti-discrimination statutes, including Title IX. Univ. of Tex. Southwestern Med. Ctr. v. Nassar, 570 U.S. 338, 360 (2013) (contrasting the "detailed statutory scheme" of Title VII with "Title IX, Section 1981, Section 1982 and the federal-sector provisions of the ADEA"). As such, the court finds that the standard for causation remains whether the protected activity was a "motivating factor" for an alleged adverse action. See Foster, 787 F.3d at 249.

Here, the court finds sufficient evidence of continuing animus to create a question of material fact for the causation prong. Plaintiff offers evidence of conduct by his superiors that demonstrate animus against him, pointing to alleged hostility all of his supervisors over the two

years. There is an email from Mr. Germain that he wanted to know "what our game plan is going to be" about plaintiff and that Mr. Germain doesn't want to "prevent us from dismissing him." Such an email where a superior openly discusses a "game plan" to terminate plaintiff without trouble is a powerful testament to causation, in spite of the temporal gap; indeed, the court finds it to be the case's equivalent of a smoking gun. Further, plaintiff's testimony about job performance requirements and discipline under other supervisors also tends to support causation. Discipline included being reprimanded for moving over a foot from where he was told to stand, and other such minor incidents. For example, when Ms. Whitworth accused plaintiff of insubordination for not immediately responding to a walkie-talkie call, plaintiff said that he had. When Ms. Whitworth accused him of lying, plaintiff got a statement from the teacher he was with that confirmed he responded. After doing so, Ms. Whitworth accused him of inappropriately disclosing a private conversation to another teacher. Such conduct is a textbook example of discipline for minor matters that courts have used as proof of causation, even if a gap of two years exists between protected activity and adverse action. Hart, 2013 WL 1867388, at *5 (citing Robinson, 982 F.2d at 895). In conjunction with Mr. Germain's email, the court finds that plaintiff has offered more than enough evidence to raise a question of material fact on the *prima facie* causation prong for the non-renewal of his contract.

However, if a jury finds plaintiff has provided a *prima facie* case at the first stage, that alone is insufficient. At the second stage, defendant must show a legitimate, nondiscriminatory reason for any adverse action against plaintiff. Pascual, 193 F. App'x. at 232. The court finds that defendant has met their burden, as defendant has put forward an array of evidence justifying their adverse employment decisions towards plaintiff. Plaintiff notes that he was denied a transfer to

Forestview High School in favor of reassignment to North Belmont Elementary School shortly after he advocated for A.C., and defendant counters with an affidavit from Forestview High School's principal explaining her discomfort with supervising a man who sent her unsolicited photos and poetry, as well as evidence of a policy of having principals be comfortable with their assistant principals. Where plaintiff argues his termination was due to his protected action and complaints of retaliation, defendant counters with evidence of three separate principals who found plaintiff was a problematic employee, citing an inability to carry out core job requirements like following instructions and communicating effectively. In doing so, defendant has satisfied its burden on summary judgment of coming forward with legitimate, nondiscriminatory reasons for adverse employment actions against plaintiff.

Thus, the burden returns to plaintiff to "show by a preponderance of the evidence that the proffered reason was pretext for discrimination." Whitaker v. Nash-Rocky Mount Bd. of Educ., 546 F. App'x. 209, 211 (4th Cir. 2013). "[A]t a minimum, proof of pretext is required to survive a defendant's motion for summary judgment." Gary, 394 F.Supp.2d at 777-78. Furthermore, in this matter plaintiff also must show that a reasonable jury could conclude that the actual reason was to retaliate against plaintiff for his protected activity. Foster, 787 F.3d at 254.

To establish pretext, plaintiff must either show that defendant's proffered reason is "unworthy of credence" or "offer other forms of circumstantial evidence sufficiently probative of retaliation." Price, 380 F.3d at 212. Appropriate other evidence includes "the strength of the plaintiff's *prima facie* case, the probative value of the proof that the employer's explanation is false, and any other evidence that supports the employer's case." Reeves, 530 U.S. at 148-49. The court may also consider the consistency of defendant's explanations for the alleged adverse

actions. Jacobs v. N.C. Admin. Office of the Courts, 780 F.3d 562, 575 (4th Cir. 2015) (holding that different explanations for an adverse employment action at different times can be "probative of pretext") (quoting EEOC v. Sears, Roebuck & Co., 243 F.3d 846, 852-53 (4th Cir. 2001)). But ultimately, it is not the court's job to decide whether a given reason for adverse action was "wise, fair, or even correct . . . so long as it truly was the reason for the plaintiff's termination." Mercer v. PHH Corp., 641 F. App'x. 233, 240 (4th Cir. 2016) (citing Hawkins v. PepsiCo., Inc., 203 F.3d 274, 279 (4th Cir. 2000)). As such, the court must rely on concrete evidence and not plaintiff's own speculation. Collier v. Charlottesville Sch. Bd., 218 F. App'x. 244, 246 (4th Cir. 2007) (affirming district court's grant of summary judgment to employer when employee relied solely on "unsubstantiated assertions" and one letter of commendation to establish pretext); Perry, 489 F. App'x. at 643 (holding that plaintiff's perceptions of aggressiveness from a supervisor were insufficient evidence at summary judgment, as they were no more than "mere speculation" and "building of one inference upon another").

Here, should a jury find that plaintiff's reassignment and surrounding circumstances constituted a materially adverse action, there is a clear issue of material fact as to whether defendant's proffered reasons were a pretext. At the time of the rescinded transfer and reassignment, defendant offered no explanation whatsoever for the decision. Only when this litigation arose and moved forward did defendant offer an explanation, through an affidavit from Forestview High School's principal explaining her personal discomfort with plaintiff. While defendant argues that the affidavit is not inconsistent with the absence of a reason for the decision, the court finds that offering no explanation at the time and only providing a reason years after the fact is the sort of inconsistency a jury could take into account as proof of pretext. Jacobs, 780 F.3d

at 575. And as outlined above, the short amount of time between learning of the alleged protected activity and taking adverse action could suggest to a jury that plaintiff's rescinded transfer and reassignment constituted retaliation.

As for the non-renewal of plaintiff's contract, plaintiff's argument is essentially that defendant's repeated transfers of plaintiff and interactions with superiors were an attempt to build two years of a paper trail before finally removing him, and that such interactions were demeaning, insulting, and impossible to fulfill. As outlined above, the court has found that such interactions were sufficient for causation. And plaintiff does offer an email that speaks strongly to both a desire to terminate plaintiff and a hope to avoid legal consequences for doing so, as Mr. Germain stated in an email that he wanted to know what the "game plan" was to get rid of plaintiff and that he "[doesn't] want to prevent us from dismissing [plaintiff]" by taking any precipitate action without approval. In doing so, the email casts another light over the alleged disciplinary actions and reassignments defendant subjected plaintiff to over the two years between his protected activity and the non-renewal of his contract, and creates a significant question of material fact as to whether defendant's proffered reasons for terminating plaintiff were genuine or were a mere pretext for retaliation for his protected activity. As a result, the court finds that a genuine question of material fact remains for a jury to resolve, and will deny defendant's motion on plaintiff's retaliation claim under Title IX.

### d. Plaintiff's retaliatory hostile work environment claim

Finally, plaintiff alleges a retaliatory hostile work environment, recently recognized by federal courts as a viable cause of action under various statutes, including Title IX. See Burlington N. & Santa Fe Ry. Co. v. White, 548 U.S. 53 (2006); Thorn v. Sebelius, 766 F.Supp.2d 585 (D.Md.

2011); <u>Gowski v. Peake</u>, 682 F.3d 1299 (11th Cir. 2012). A hostile work environment is one that is "permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." <u>Boyer-Liberto</u>, 786 F.3d at 277. To establish retaliation under this theory, plaintiff must show that the employer's creation of a hostile work environment amounted to a materially adverse employment action. <u>Burlington Northern</u>, 548 U.S. at 68. Materiality is objective and is exemplified by acts that "carry a significant risk of humiliation, damage to reputation, and a concomitant harm to future employment prospects," but "mere inconvenience" or "alteration of job responsibilities" are insufficient. <u>Fordyce</u>, 43 F.Supp.3d at 552 (citing <u>Reinhardt v. Albuquerque Pub. Sch. Bd. of Educ.</u>, 595 F.3d 1126, 1133 (10th Cir. 2010)); <u>see also</u> <u>Hartsell v. Duplex Products, Inc.</u>, 123 F.3d 766, 773 (4th Cir. 1997) (noting that there is not a "federal cause of action for mere unpleasantness" and plaintiff must show such severe or pervasive behavior as to render the workplace "objectively hostile or abusive").

For reasons similar to those outlined above in analyzing plaintiff's Title IX retaliation claim, the court finds a question of material fact exists for the jury pursuant to Title IX. The record is replete with examples of intimidation and altered employment conditions, from Ms. Whitworth threatening to fire plaintiff at the first sign of trouble, to ordering him *to clean the bathrooms*, to performance requirements and reprimands that strain credulity, and negative performance reviews that could impact future employment prospects. Taken together, the court finds there is sufficient evidence to create a question of fact for a jury to resolve on whether a materially adverse employment action occurred in the form of a hostile work environment, and will deny summary judgment on this count.

*e. Defendant's motion to continue*

As the court's ruling on summary judgment is related to defendant's Second Motion to Continue (#60) and plaintiff's opposition, the court wishes to allow both parties time to digest the court's findings before determining whether a continuance is warranted. The court encourages both parties to review this Order, for respective counsel to meet and confer and discuss resolution in light of this Order, and to file a supplemental status update no later than noon on Wednesday, April 11, all of which will help the court in determining whether a continuance, or even proceeding to trial at all, is genuinely necessary in this matter.

Overall, the court finds that plaintiff has failed to offer sufficient evidence of free speech violations for his First Amendment claim under § 1983 to survive summary judgment. However, the court will allow plaintiff's array of racial discrimination claims under § 1981 and Title VI to proceed, despite the court's concern over the quantum of the evidence as it appears at this point in time. Finally, genuine issues of material fact exist to allow plaintiff's retaliation and retaliatory hostile work environment claims under Title IX to proceed to trial. Having thus considered defendant's motion and reviewed the pleadings, the court enters the following Order, and hopes that the parties will take the court's findings and recommendations to heart and reach an amicable resolution in this matter.

## ORDER

**IT IS, THEREFORE, ORDERED** that defendant's Motion for Summary Judgment (#38) is **GRANTED** in part and **DENIED** in part as follows:

(1) Summary judgment on plaintiff's § 1983 claim is **GRANTED**;

(2) Summary judgment on plaintiff's § 1981 and Title VI claims is **DENIED**;

(3) Summary judgment on plaintiff's Title IX retaliation and retaliatory hostile work environment claims is **DENIED**.


Signed: April 5, 2018

Max O. Cogburn Jr.
United States District Judge